# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CLIFFORD LEWIS, II** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 06 C 2660** |
| | ) | |
| | ) | **Mag. Judge Michael T. Mason** |
| **JO ANNE B. BARNHART,** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant, Clifford Lewis, II ("Lewis" or "claimant"), has brought a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Lewis' claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. §§ 416 (i) and 423. The Commissioner filed a cross motion for summary judgment asking that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

## BACKGROUND

## Procedural History

Lewis filed an application for DIB on May 5, 2004, alleging a disability onset date of April 12, 2004. (R. 65, 93). He alleged that he was disabled as a result of stomach

pain and vomiting. (R. 83). His application was initially denied on September 22, 2004 and after a timely request for reconsideration on January 19, 2005. (R. 34, 40-43). Thereafter, claimant requested a hearing. (R. 44). ALJ Robert G. White held a hearing on September 21, 2005 in Orland Park, Illinois. (R. 244-284). Claimant and Thomas Dunleavy, a vocational expert ("VE"), testified at the hearing. (*Id.*) On October 13, 2005, ALJ White issued a written decision finding that Lewis was not disabled. (R. 20-27). The Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner. (R. 6-8); *Estok v. Apfel*, 152 F. 3d 636, 637 (7th Cir. 1998). Lewis subsequently filed this action in the district court.

**Medical Evidence**

Lewis reported that he began experiencing episodes of nausea and vomiting every other month since 1999. (R. 151-152). However, he also reported that he first saw Dr. Charlotte Mitchell, his primary care physician, in November 2002. (R. 100). The record shows that claimant saw Dr. Mitchell regularly throughout 2003 until approximately July of 2004. (R. 187-205).

According to Dr. Mitchell's January 13, 2003 progress notes, claimant had been complaining of vomiting for one week and had visited the emergency room on January 9, 2003.[1] (R. 205). Dr. Mitchell noted that she planned to perform an upper GI series and to check claimant for H. Pylori, a bacterium that causes chronic inflammation (gastritis) of the inner lining of the stomach. (R. 126, 205). Dr. Mitchell also noted the prescription drug Nexium to be given once daily. (R. 205). Lewis was subsequently

---

[1]The administrative record contains no records from this emergency room visit.

tested for the presence of H. Pylori on January 13, 2003, and the results were positive. (R. 215). An X-ray upper GI with air contrast was performed at St. James Hospital ("St. James") on January 18, 2003. (R. 206). The results showed an essentially normal upper GI without evidence of ulceration or gastroesophageal reflux. (*Id.*).

Claimant returned to Dr. Mitchell's office two weeks later on February 8, 2003 complaining of abdominal pain and nausea. (R. 204). Dr. Mitchell noted a tender epigastrum on exam, but her listed impression for this visit cannot be deciphered. (*Id.*). Claimant was next seen by Dr. Mitchell on March 8, 2003. (*Id.*). At that visit, he reported frequent bowel movements, but also that his stomach was feeling much better. (*Id.*). Dr. Mitchell noted a benign abdomen, as well as the positive result of H. Pylori Gastritis. (*Id.*). She prescribed Prevacid daily as needed. (*Id.*).

Lewis returned to see Dr. Mitchell on May 7, 2003 complaining of stomach problems and vomiting over the past three days. (R. 203). Dr. Mitchell's notes state "admit," and claimant was subsequently admitted to St. James on May 7, 2003 for intravenous ("IV") diuresis, antiemetic therapy, and evaluation of the cause of his persistent vomiting. (R. 132-33). Lewis responded to IV fluids, but continued to vomit. (R. 131). Dr. Shyamal Bose, a gastroenterologist, was consulted regarding claimant's continued vomiting. (R. 131, 134). Dr. Bose performed an upper gastrointestinal endoscopy on May 13, 2003. (R. 145). Dr. Bose noted a very spastic pylorus, minimal bile reflux gastritis, and marked spasmodic activity evidenced in the gastric mucosa. (*Id.*). However, Dr. Bose opined that these findings were not diagnostic of any significant pathology to explain claimant's problem. (*Id.*). Several other imaging tests were performed during this admission and were essentially normal or unremarkable.

3

(R. 142-44).  Upon discharge, Dr. Mitchell noted that claimant had started taking Reglan four times per day with improvement.  He was told to continue with Reglan and take Protonix once daily.  (R. 131).

Lewis returned to Dr. Mitchell on May 21, 2003 for a follow up visit which was essentially unremarkable.  (R. 203).  At his next visit, on August 13, 2003, claimant reported nausea and the inability to eat over the past three days.  (R. 202).  Dr. Mitchell diagnosed claimant with acute gastroenteritis, prescribed Compazine, Reglan and Protonix, and instructed him to follow up in one week.  (*Id.*).  Lewis returned to Dr. Mitchell's office as instructed on August 18, 2003.  He was still complaining of stomach problems and the inability to tolerate most foods.  (R. 201).  Claimant also reported that he had been in the emergency room the previous day but had not been seen.  (*Id.*).  Dr. Mitchell made a note on this date that claimant was off of work.  (*Id.*).  The medications listed at this visit included Prevacid, Reglan, Compazine, Ambien and Xanax.  (*Id.*).

Two days later, on August 20, 2003, claimant reported that he had vomited the previous evening and may have vomited blood.  (R. 200).  Dr. Mitchell's notes state that claimant would be admitted to the hospital.  (*Id.*).  While claimant had reported fever, chills, and multiple episodes of vomiting the date prior to his admission, he refused the treatment recommended to him as an inpatient and was discharged on August 21, 2003.  (R. 147-148).  Specifically, the records from claimant's stay state that he was scheduled to get several tests to determine the origin of his complaints, but refused when he was informed he would not be able to eat.  (*Id.*).  When claimant was offered a meal, he refused it, then demanded to speak to Dr. Mitchell.  (R. 150).  Dr. Mitchell spoke to claimant and discharged him after he stated that he felt much better.  (R. 147).

4

Lewis visited Dr. Mitchell again three weeks later, on September 12, 2003. (R. 199).
Claimant reported improvement in his condition. (*Id.*).

On December 5, 2003, claimant returned to Dr. Mitchell complaining of vomiting
in the past day accompanied by stomach pains. (R. 198). His current medications at
this visit were listed as Xanax twice daily. (*Id.*). Dr. Mitchell made a diagnosis of acute
gastroenteritis and prescribed two additional medications, Reglan and Prevacid. (*Id.*).
Claimant was instructed to follow up in one week at the office. (*Id.*). However, on
December 9, 2003, Lewis was admitted to St. James after presenting with refractory
nausea and vomiting. (R. 161). Claimant underwent a colonoscopy which revealed
diverticulitis and pylorospasm. (*Id.*).

On December 10, 2003, Dr. Shyamal Bose evaluated claimant again. (R. 164-
65). At this time, Dr. Bose discussed maintaining a high-fiber diet and the need for
another upper GI endoscopy. (*Id.*). On December 12, 2003, Dr. Bose performed an
upper GI endoscopy and found no ulcers and no significant gastritis but he noted that
some pylorospasm was encountered. (R. 171). Dr. Bose suggested that claimant
continue with his current medications. (*Id.*). Dr. Bose also stated that "a psychological
evaluation is a consideration." (*Id.*). X-rays of the abdomen and small bowel revealed a
nonspecific gas pattern and an unremarkable small bowel follow through. (R. 170, 174).
Claimant was discharged from St. James on December 12, 2003, on Reglan and
Protonix and ordered to follow up with Dr. Mitchell in one week. (R. 161).

Claimant returned to Dr. Mitchell's office on December 15, 2003. (R. 197). At
this visit, he reported that he last vomited the previous day but was doing better and
was tolerating fruits. (*Id.*). Dr. Mitchell instructed him to continue with his medications

and to follow up with her in two weeks.  (*Id*.).  On December 29, 2003, Lewis reported feeling better.  (R. 196).  He also had no complaints during his visit with Dr. Mitchell on January 14, 2004.  (R. 195).

However, Lewis returned to Dr. Mitchell's office on January 21, 2004 with episodes of nausea, vomiting and diarrhea.  (R. 194).  At this visit, Dr. Mitchell noted a diagnosis of Irritable Bowel Syndrome and prescribed Zelnorm twice per day.  (*Id*.).  On January 28, 2004, claimant saw Dr. Mitchell again and reported vomiting two to three times and generally feeling unwell for the past week.  (R. 193).  Dr. Mitchell prescribed Compazine and instructed claimant to continue with his current medications.  (*Id*.).  On March 31, 2004, Lewis complained of nausea, vomiting and constipation over the past week.  (R. 191).  Dr. Mitchell prescribed Reglan, Protonix and Zofran.  (*Id*.).

On April 7, 2004, claimant reported nausea and vomiting three times a day.  (R. 190).  Dr. Mitchell prescribed Protonix and Prevacid and noted that a GI evaluation was scheduled for May 7, 2004.  (*Id*.).  At a check-up on April 20, 2004, Dr. Mitchell prescribed Zelnorm and noted that a GI evaluation was scheduled for May 26, 2004.  (R. 189).  On May 14, 2004, claimant reported a decrease in nausea, vomiting and abdominal pain.  (R. 178).  Dr. Mitchell increased the dosage of Zelnorm.  (*Id*.).  At claimant's next visit, claimant reported improvement while taking the Zelnorm.  (R. 188).  Dr. Mitchell diagnosed Irritable Bowel Syndrome and continued claimant's Zelnorm prescription.  (*Id*.).

Lewis saw Dr. Adrienne L. Fregia, a specialist in the areas of internal medicine and gastroenterology, on June 18, 2004.  (R. 182).  Dr. Fregia described claimant as a patient with a history of H. pylori positively and abdominal pain mainly under stress, with

6

occasional episodes of vomiting. (*Id.*). Claimant presented with occasional abdominal pain, mainly in his upper abdomen when under significant stress. (*Id.*). Dr. Fregia ordered a CT scan as well as an upper endoscopy, and planned to make further recommendations once these tests were completed. (*Id.*). On June 22, 2004, Dr. Fregia performed an upper endoscopy with CLOtest biopsy. (R. 184). Dr. Fregia's postoperative diagnosis indicated a prolapsing hiatal hernia, gastritis, and duodenitis. (R. 185). Dr. Fregia stated that she would make further recommendations once the CLOtest results were available. (*Id.*). On July 7, 2004, Dr. Fregia reported to Dr. Mitchell that claimant had been "doing well since [they] discussed antireflux measures." (R. 183). Dr. Fregia indicated that claimant would take Prevacid and Zelnorm and continue monitoring his diet and lifestyle. (*Id.*).

On July 9, 2004, Lewis returned to see Dr. Mitchell. (R. 187). Dr. Mitchell noted that surgery had been suggested by the GI specialist and that claimant had disability forms for her to fill out. (*Id.*). Dr. Mitchell instructed claimant to continue with Zelnorm and Reglan. (*Id.*).

On November 5, 2005, claimant went to the emergency room at St. James Hospital. (R. 243). He complained of nausea, vomiting and abdominal pain. (*Id.*). Claimant was instructed to take his medication as directed and to follow up with his doctor in 24-48 hours. (*Id.*).

The record contains an appointment reminder card from Woody Wilson Health Center in Phoenix, Illinois. (R. 242). Claimant was scheduled for appointments on December 13, 2005 and March 31, 2006. (*Id.*). However, there are no medical records from Woody Wilson Health Center, so it is unclear whether claimant kept these

appointments.

Claimant was admitted to St. James Hospital for one day on February 15, 2006. (R. 232). The diagnosis was intractable abdominal pain. (*Id.*). Lewis was prescribed Prevacid, Vicodin and Xanax and told to follow up with his doctor as needed. (*Id.*). On March 3, 2006, claimant went to the emergency room at John H. Stroger, Jr. Hospital. (R. 233-34). He complained of abdominal pain and vomiting for the last three weeks. (R. 233). The diagnosis was abdominal pain and a "likely hiatal hernia." (R. 234). Claimant was given a referral for a gastroenterology clinic for March 23, 2006. (R. 234). There are no records from this clinic.

Next, claimant was seen in the emergency room at St. James on March 6, 2006. (R. 235-39). He was diagnosed with peptic ulcer disease and a urinary tract infection. (R. 235- 36). Lewis was instructed to make an appointment in two days with Dr. F. Porter. (R. 235). Again, it is unclear whether claimant ever saw Dr. Porter.

**Disability Forms**

Dr. Mitchell filled out two disability forms for claimant on July 9, 2004, the date of his last visit. (R. 226-231). Dr. Mitchell stated that she had recommended that claimant stop working on March 30, 2004 due to his condition. (R. 226). Dr. Mitchell diagnosed claimant with a prolapsing hiatal hernia, gastritis, and duodenitis. (R. 226, 230). Dr. Mitchell noted that claimant had no physical impairments but that his physical capacity depended upon whether or not he was having recurrent vomiting. (R. 227-28, 231). She stated that Lewis "has impaired daily functions due to refractory vomiting" and that he is "unable to work due to refractory nausea and vomiting." (R. 228, 231). Dr. Mitchell indicated that claimant had made no significant progress. (R. 228). However,

8

she noted that claimant's prognosis was fair and that she expected claimant to return to his prior level of functioning in December 2004. (R. 231). Dr. Mitchell recommended that claimant return to work full time on December 15, 2004. (R. 229).

**Claimant's Testimony**

At the time of the hearing, Lewis was 29 years old**.** (R. 249). He obtained a high school diploma and completed some college, but has no formal certificates or degrees from those studies. (R. 249). In the past, he worked as a cashier, a dishwasher, a service clerk in a grocery store, and as a packer. (R. 260-264). Lewis was terminated from his last job in July 2004. (R. 264). However, he had been on his employer's disability program between April and July 2004. (R. 264-65). Claimant explained that when he exhausted his options under the leave program, he was fired. (R. 265). He stated that he lost his job because he was always sick. (R. 251). When that happened, claimant lost his medical insurance and all of his benefits. (*Id.*). As a result, claimant's treatment stopped. (*Id.*).

On the date of the hearing, claimant stated his last episode of nausea and vomiting was three weeks ago. (R. 260). At the time, claimant was doing part-time inventory work which involved a lot of movement, such as standing and crouching. (*Id.*). That job only lasted about a week and a half. (*Id.*). When the ALJ asked claimant what he did yesterday, claimant reported that he laid still and ate no solid foods. (*Id.*). Claimant also testified that he is weak all of the time, though he tries to do stretches and exercises to keep up his strength. (R. 260-61).

Claimant agreed that his doctors had indicated that his condition is aggravated,

or becomes a problem, when he is under stress.  (R. 259).  However, claimant testified

that he felt that his condition was caused by bacteria in his stomach and that he did not

know if stress contributed to his condition.  (R. 272).

Claimant testified about the frequency and duration of his episodes.  (R. 268-69).

Claimant first stated that his vomiting spells last two weeks, and that during this time he

may vomit everyday, up to five times per day.  (*Id.*).  Claimant explained that after one

of these episodes, he would be okay for about one and a half weeks.  (*Id.*). Claimant

testified that he had experienced four such spells this year.  (*Id.*).  The ALJ noted that it

was September and that claimant's testimony did not make mathematical sense.  (R.

268).  Lewis then clarified that the two week spells occur approximately every other

month.  (*Id.*).

Claimant also testified about the medical treatment that he has received since he

lost his job.  (R. 251-56).  Lewis reported that he had visited the ER at times, but

preferred not to seek treatment there because of the long wait times and the inability to

get medication.  (R. 251).  Claimant also explained his attempts to seek treatment at

various clinics.  (R. 252-253).  Claimant testified that the first clinic he called was not

accepting new patients, and that the second clinic had told him they would not be

accepting patients until the end of the month.  (R. 253).  Lewis reported that a third clinic

in Robbins, Illinois was available to him, but that this clinic was "out of his range" and he

was unable to make arrangements to get there yet.  (*Id.*).

The ALJ then asked claimant what could be more important than waiting at Oak

Forest for however long it took to see a doctor and get a referral, especially because

Zelnorm seemed to help him.  (R. 255).  Claimant testified that Zelnorm helped his

bowels move but that it did not eliminate any pain or stop his vomiting. (*Id.*). Lewis further testified that sitting in the emergency room does not help because they would just refer him to a clinic. (*Id.*). He explained that he was trying to make arrangements to go to the clinic in Robbins. (*Id.*).

The ALJ also questioned the urgency of claimant's problems due to his failure to obtain recommended care. (R. 256). Claimant explained that his problem was urgent because it affected his whole life. (*Id.*). Lewis further stated that he had tried very hard to get into a clinic but that his resources were depleted and he had to rely on other people to help him make arrangements. (*Id.*). When the ALJ asked claimant why he had not applied for public aid or otherwise obtained a medical card, Lewis said that he was unaware of how to do so or if he qualified. (R. 271).

Claimant also testified as to why he believed he was unable to work. (R. 253). Lewis testified that he experienced frequent and severe periods of vomiting, and nearly constant nausea. (*Id.*). He also stated that he required medication to help control his condition, and may require surgery as well as treatment for bacteria in his stomach which he believes contributes to his condition. (R. 273). Claimant further testified that the unpredictability of his illness would prevent any employer from trusting him. (R. 271).

Lewis explained that he believed that the four episodes of vomiting he experienced in 2004 still would have occurred even if he was taking Reglan and Zelnorm because he had experienced such episodes in the past while taking those medications. (R. 273). The ALJ asked claimant if he remembered the dates of his four episodes in 2004. (*Id.*). Claimant said that he did not remember the exact dates but he

could tell the ALJ the approximate months in which they occurred.  (*Id.*).

**Vocational Expert Testimony**

Thomas Dunleavy, a vocational expert ("VE"), testified at claimant's hearing.  (R. 274-79).  He reviewed the written record and was present throughout the hearing.  (R. 247, 274-75).  VE Dunleavy testified that claimant's past work experience ranged from light, unskilled work as a cashier to medium, unskilled work as a kitchen helper and car detailer, to heavy, unskilled work as a warehouse laborer, hand packager and dock worker.  (R. 274-76).  The ALJ asked the VE whether a person of claimant's age, education and work experience, limited to sedentary, simple, unskilled work, could perform claimant's past relevant work.  (R. 276-77).  VE Dunleavy testified that such an individual could not perform any of claimant's past work.  (R. 277).  The ALJ then asked if such an individual would be capable of performing any other work.  (*Id.*).  VE Dunleavy testified that such an individual could perform work as an assembler (6,000), cashier (3,000), and visual inspection packager (4,000).  (*Id.*).

The ALJ then asked VE Dunleavy to discuss how an individual's absences may impact his ability to work.  (*Id.*).  Specifically the ALJ asked how long an employer would tolerate an employee missing eight to ten days per month.  (*Id*).  VE Dunleavy opined that an employer may tolerate this number of absences for approximately one month.  (R. 277).  Claimant's attorney asked VE Dunleavy how an employer would tolerate an employee missing two weeks four times per year.  (*Id*).  The VE opined that this amount of absences would preclude gainful employment regardless of the RFC.  (R. 276-77).  The VE further opined that unskilled work environments will usually tolerate eight to nine absences per year, though he clarified that his opinions in this area were based on his

own research and discussions with employers.  (R. 276, 279).

**STANDARD OF REVIEW**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Charter*, 55 F.3d 300, 305 (7th Cir. 1995) *(quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record, but we will not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner.  *Lopez v. Barnhart*, 336 F.3d. 535, 539 (7th Cir. 2003).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Id.*  While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion, [he] need not discuss every piece of evidence in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning.'"  *Carlson v. Shalala*, 999 F.2d 180,181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284,287 (7th Cir. 1985)).

**LEGAL ANALYSIS**

**I**.  **Analysis Under the Social Security Act**

To be entitled to disability insurance benefits under the Act, the claimant must

establish that he is under a disability. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 886-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

At step one, the ALJ found that claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity since his alleged onset date of April 12, 2004. (R. 21). At step two, the ALJ found that claimant's impairments of a prolapsing hiatal hernia, gastritis, and duodenitis, which result in abdominal pain, nausea, vomiting, and constipation, are severe. (*Id.*). At step three, the ALJ found that claimant's impairments were not severe enough, either alone or in combination, to meet or medically equal any impairment that the Commissioner considered conclusively disabling. (R. 21-22). The ALJ then determined that claimant retained the residual functional capacity ("RFC") to perform unskilled sedentary work involving lifting and

14

carrying of objects up to ten pounds. (R. 24-25). At step four, the ALJ found that

claimant was not capable of performing any of his past relevant work, as his previous

job duties were all beyond his currently determined RFC. (R. 25-26). Finally, at step

five, the ALJ concluded that claimant was capable of performing a full range of

sedentary work, which exists in significant numbers in the national economy. (R. 26-

27). For these reasons, the ALJ concluded that Lewis was capable of making a

successful adjustment to work in the national economy and that as such, he was not

under a disability as defined in the Act. (*Id.*).

Claimant argues that the ALJ failed to properly evaluate the medical evidence;

that he erred in assessing claimant's credibility; that he applied incorrect legal standards

in evaluating claimant's lack of medical treatment; and that he erred in applying the grid.


**II**.    **The ALJ Properly Evaluated The Medical Evidence.**

   **A.     The ALJ Did Not Ignore Dr. Mitchell's Statements That Claimant's
            Symptoms Would Interfere With His Ability To Work.**

Claimant contends that the ALJ erred in rejecting Dr. Mitchell's opinion that

claimant's symptoms were disabling. In particular, claimant argues that the ALJ erred in

rejecting Dr. Mitchell's opinion because in doing so, the ALJ effectively ignored Dr.

Mitchell's statements that claimant suffered from refractory vomiting and nausea, and

when present, these symptoms would interfere with his ability to work. This Court

disagrees. The ALJ did not ignore Dr. Mitchell's statements in this regard. Instead, the

ALJ agreed that the issue of whether claimant could work depended on how often

claimant would be incapacitated by his symptoms.  (R. 24).  However, the ALJ

questioned the credibility of the claimant with respect to his allegations of refractory

vomiting and nausea.  (*Id.*).

Lewis complains that the ALJ should not have linked the validity of Dr. Mitchell's

report to claimant's credibility because at the time of her report, Dr. Mitchell had been

treating claimant for more than a year and a half and had hospitalized him on multiple

occasions.  According to claimant, Dr. Mitchell's report was not a doctor's recording of

his patient's subjective symptoms.  However, the ALJ did not reject Dr. Mitchell's

opinion solely on the basis that claimant's allegations lacked credibility.  Rather, the ALJ

decided to give greater weight to the opinion of Dr. Fregia.  (*Id.*).  As discussed more

fully below, the ALJ's decision to do so is supported by substantial evidence.


### B.    The ALJ's Decision To Reject Dr. Mitchell's Opinion And Give More Weight To Dr. Fregia's Opinion Is Supported By Substantial Evidence.

Claimant argues that the ALJ should have given Dr. Mitchell's opinion significant

weight because Dr. Mitchell had the longitudinal view of claimant's condition.  On July 9,

2004, Dr. Mitchell opined that claimant had "impaired daily functions due to refractory

vomiting" and that he was "unable to work due to refractory nausea and vomiting."  (R.

228, 231).  Dr. Mitchell reported that she expected claimant to return to his prior level of

functioning and return to work full time in December 2004.  (R. 229, 231).  In contrast,

on July 7, 2004, Dr. Fregia, claimant's gastroenterologist, reported to Dr. Mitchell that

claimant had been "doing well since [they] discussed antireflux measures."  (R. 183).

Dr. Fregia indicated that claimant would take Prevacid and Zelnorm, continue monitoring his diet and lifestyle, and follow up with Dr. Mitchell in the near future. (*Id.*).

Pursuant to the regulations, the Commissioner generally gives more weight to opinions from the claimant's treating sources because those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s). 20 C.F.R. § 404.1527(d)(2). Therefore, if the ALJ finds that the treating source's opinion on the nature and severity of claimant's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the ALJ gives it controlling weight. *Id.* When an ALJ does not give the treating source's opinion controlling weight, the ALJ is required to apply various other factors in determining the weight to give it, including whether a physician is a treating or examining physician; the length of the relationship; the nature and extent of the treatment relationship; whether the physician is a specialist; and the consistency and supportability of the physician's opinion. 20 C.F.R. §§ 404.1527(d)(2)-(5). The basis for the determination made by the ALJ must be accompanied by an explanation. 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ gave greater weight to the opinion of Dr. Fregia, a specialist in the field of gastroenterology. Dr. Fregia saw claimant on three occasions and performed an upper endoscopy on claimant. (R. 182-85). The ALJ explained that he adopted Dr. Fregia's opinion because she was more of a specialist than Dr. Mitchell and because Dr. Fregia was treating claimant specifically for his severe impairments. (R. 24). Under the regulations, the ALJ was clearly entitled to give more weight "to the opinion of a

17

specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §404.1527(d)(5). Furthermore, the fact that Dr. Mitchell may have been able to provide a longitudinal view of claimant's condition does not mean that the ALJ was required to give Dr. Mitchell's opinion controlling weight. *See Crawford v. Apfel*, 2000 U.S. Dist. LEXIS 13058, *25 (N.D. Ill. 2000) (citing *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996)). It was up to the ALJ to decide which doctor to believe. *Id.* Because the ALJ properly explained his reasons for adopting Dr. Fregia's opinion, and because the regulations explicitly allow greater weight to be given to the opinion of a specialist, we see no reason to remand on this basis.

Moreover, an ALJ is not required to accept any opinion that a claimant is "disabled" or "unable to work." 20 C.F.R. §404.1527(e)(1). Lewis fails to recognize that the determination or decision about whether a claimant meets the statutory definition of disability is something reserved to the Commissioner. *Id.* Indeed, the Seventh Circuit has stated that the final decision as to whether a claimant is disabled or not "is a legal one rather than a medical one, and it is for the ALJ to make that decision." *Kaputsa v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990) (citing 20 C.F.R. § 404.1527). Consequently, the ALJ was not required to accept Dr. Mitchell's opinion that claimant was unable to work.

Claimant also argues that the ALJ erred in rejecting Dr. Mitchell's opinion because he based his decision, in part, on the fact that the State Agency medical consultant determined that claimant's impairments were not severe. According to Lewis, this is illogical because the ALJ rejected the State Agency physician's opinion,

18

finding that it was inconsistent with the overall record that claimant's impairments are severe.  (R. 24).  This Court agrees that it makes little sense to reject the State Agency physician's opinion and then cite it as a basis for rejecting Dr. Mitchell's opinion. However, as discussed above, the ALJ's decision to give more weight to Dr. Fregia's opinion rather than Dr. Mitchell's opinion is supported by substantial evidence. Therefore, we find that any error in this regard was harmless and remand on this basis is not warranted.  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (stating that "no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### C.     The ALJ Did Not Make Improper Medical Conclusions.

Next, claimant argues that the ALJ erred in assuming, without current medical evidence, that claimant's condition could be controlled with medication.  According to claimant, the ALJ's assumption is not supported by substantial evidence.  This Court disagrees.  Dr. Fregia's July 7, 2004 report to Dr. Mitchell clearly states that claimant had been "doing well since [they] had discussed antireflux measures."  (R. 182).  Dr. Fregia's report also indicates that claimant would take Prevacid and Zelnorm and continue monitoring his diet and lifestyle.  (*Id.*).  The ALJ stated that it was "reasonable to conclude from Dr. Fregia's report that claimant's conditions could be controlled with medication."  (R. 24).  This Court finds that the ALJ did not make any wild, unsupported assumptions in this case.  Rather, he based his conclusion on the report of a specialist who was treating claimant specifically for his severe impairments.  (R. 24).

Next, claimant argues that the ALJ's conclusion is not supported by the record because the record demonstrates that claimant had experienced recurrent symptoms while taking medication in the past. Again, we disagree. It is important to note that the vast majority of claimant's medical treatment occurred outside the relevant time period. Indeed, most of claimant's treatment occurred prior to the alleged onset date of April 2004, and claimant was not being treated by a specialist at that time. As discussed above, it was perfectly reasonable for the ALJ to give more weight to Dr. Fregia's opinion than to Dr. Mitchell's opinion. 20 C.F.R. §404.1527(d)(5).

Additionally, we are not persuaded by claimant's suggestion that the ALJ erred because his conclusion was not based on current medical records. The ALJ based his conclusion on the medical records available to him at the time of his decision. Simply put, claimant bears sole responsibility for the fact that there were no current medical records before the ALJ. The last report from claimant's gastroenterologist indicated that he was doing well. (R. 182). The few records claimant submitted following his last visit to Dr. Mitchell in July 2004 are insufficient to support claimant's contention that he continued to have frequent recurrent episodes that would impact his ability to work. After July 2004, claimant's only treatment consisted of spotty emergency room visits in November 2005, and February and March 2006.[2] Moreover, the ALJ specifically mentioned claimant's failure to seek treatment after July 2004 as a reason for his credibility determination. (R. 23).

Because the ALJ properly evaluated the medical source opinions and did not

---

[2] In addition to the ER visits, the record contains a few referrals to clinics that claimant admitted he did not visit.

make any improper medical conclusions, remand is not warranted.

### III. The ALJ's Credibility Determination Complies With SSR 96-7p.

Claimant also argues that the ALJ's credibility determination failed to comply with the requirements of SSR 96-7p. To succeed on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations. Because the ALJ is best positioned to evaluate the credibility of a witness, we will reverse the ALJ's credibility finding only if it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must comply with the requirements of Social Security Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Under SSR 96-7p, the ALJ must articulate the reasons behind his credibility finding:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible". . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.

Here, the ALJ set forth specific reasons for his credibility finding in compliance with SSR 96-7p. (R. 23-24). In particular, ALJ White found that claimant's allegations lacked credibility because at the hearing, claimant made inconsistent statements

regarding the frequency of his episodes.[3]  (R. 23).  The ALJ believed that if claimant had experienced periods of severe, recurrent nausea and vomiting for two weeks at a time, which caused pain, dehydration, unemployment and financial destitution, claimant would remember more precisely how frequently these episodes occurred.  (*Id.*).  The ALJ also noted claimant's failure to seek treatment after 2004.  (*Id.*).  ALJ White discussed claimant's stated reasons for not seeking treatment but still found it remarkable that claimant demonstrated such little interest in obtaining further medical treatment if he was suffering from recurrent, debilitating symptoms.  (R. 24).

The ALJ also noted that claimant did not allege significant weight loss, as might be expected of a person suffering from repeated and protracted episodes of vomiting and abdominal pain.  (*Id.*).  Claimant argues that the ALJ's assumption regarding claimant's weight loss is based on factual error because Lewis testified at the hearing that his normal weight was around 160 pounds, whereas the medical records from 2003-04 documented a weight range from 176-200 pounds.  The fact that claimant may have weighed more in 2003-04 does not mean that claimant alleged that his condition caused significant weight loss.  Simply put, claimant never made this allegation.  (R. 248-273).  Accordingly, there was no factual error.

The ALJ also found it unbelievable that claimant worked from January 2003 through April 2004 while his employer tolerated eight or nine absences every other month for a year and a half.  (R. 23).  Claimant challenges this reasoning because

---

[3] Claimant initially testified that he had episodes in which he vomited up to five times per day for about two weeks each month.  (R. 268-69).  After the ALJ challenged claimant's testimony in this regard, claimant clarified that the two week spells occur approximately every other month.  (*Id.*).

according to claimant, the record demonstrates that he experienced frequent exacerbations of his condition and he testified that he was fired from his job because of his frequent absences. However, the ALJ's reasoning finds support in the record. In particular, the ALJ stated that the belief that claimant's employer tolerated such absences for a year and a half would not be reasonable in light of the VE's testimony that an unskilled employee such as claimant likely would have been dismissed within the first month if he missed eight or nine days in that month. (*Id.*).

Based on the foregoing, we cannot conclude that the ALJ's credibility finding was "patently wrong." The ALJ gave specific reasons for his credibility determination in accordance with SSR 96-7p and his observations find support in the record. Therefore, remand is not warranted. *Powers,* 207 F.3d at 435; *see also, Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993) (recognizing that a reviewing court should not reconsider credibility determinations made by the ALJ as long as they find some support in the record).

## IV.     The ALJ Correctly Analyzed Claimant's Lack Of Treatment.

Lewis argues that the ALJ's decision to deny his claim was based in part on the ALJ's opinion that claimant's condition could be controlled with treatment. Claimant argues that the issue is not whether his condition could be controlled with treatment, but whether treatment, if followed, would restore claimant's ability to work. Lewis contends that the ALJ applied an improper legal standard in denying his claim. In support of this argument, he cites to 20 C.F.R. § 404.1530(a) and SSR 82-59.[4] However, these

---

[4] Pursuant to 20 C.F.R. § 404.1530(a), in order to get benefits, the claimant must follow treatment prescribed by his or her physician if the treatment could restore the claimant's ability to work. SSR 82-59

regulations apply when a claimant fails to follow prescribed treatment.  Here, the ALJ did not deny claimant's request for benefits because claimant failed to follow prescribed treatment.  Instead, the ALJ discussed claimant's failure to obtain treatment available to him as a component of his credibility determination.  (R. 23-24).

SSR 96-7p allows an ALJ to assess frequency of treatment and compliance with a treatment regimen when assessing a claimant's credibility.  SSR 96-7p.  Indeed, SSR 96-7p states that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . "  SSR 96-7p.  While an ALJ may not draw any inferences about failure to seek treatment without first considering any explanations that the claimant may offer, the ALJ did so here.  *Id.*

At the hearing, the ALJ questioned Lewis specifically about his failure to obtain care at the free clinics he was referred to, and the fact that he never inquired about a public aid medical card.  (R. 255-56, 271).  The ALJ explicitly discussed claimant's stated reasons for failing to obtain treatment.  (R. 23-24).  Nevertheless, the ALJ found that claimant was not motivated to seek treatment for his conditions because more than one year had passed since claimant was referred to the free clinics.  (*Id.*).  The ALJ explained that claimant could have waited at Oak Forest hospital for treatment or persevered at one of the three free clinics offered to him if he was motivated to do so.  (*Id.*).  Furthermore, the ALJ found it remarkable that claimant demonstrated such little interest in obtaining further treatment if he was suffering from the recurrent, disabling symptoms that allegedly led to his unemployment and financial ruin.  (*Id.*).

explains the criteria necessary for a finding of failure to follow prescribed treatment when an individual, who would otherwise be found to be under a disability, fails to obtain recommended treatment.

Contrary to claimant's suggestion, the ALJ did not apply an improper legal standard when he considered claimant's lack of current treatment. Instead, the ALJ complied with SSR 96-7p in assessing claimant's failure to pursue treatment. Accordingly, remand on this issue is not warranted.

## V.     The ALJ Did Not Err in Applying the Grid.

Claimant argues that he has significant, non-exertional impairments which preclude the use of the grid when evaluating his claim. The grid is a chart which classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. *See* Appendix 2, Subpart P, Part 404, Chapter III, 20 C.F.R. §§ 200.00-204.00 (1987). If use of the grid is appropriate, the ALJ may rely upon it in determining disability and in such a case, the grid alone constitutes substantial evidence sufficient to uphold the ALJ's decision. *Walker v. Bowen*, 834 F.2d 635, 641 (7th Cir. 1987). That being said, use of the grid is inappropriate if the claimant suffers from severe non-exertional impairments which prevent the claimant from performing the work indicated by the grid. *Walker*, 834 F.2d at 641. However, the Seventh Circuit has specifically stated that, "[t]he fact that a claimant suffers from a non-exertional impairment does not . . . immediately preclude utilization of the grid." *Id.* In such a case, the ALJ must determine whether the non-exertional impairments are severe enough to substantially limit the claimant's abilities. *Id.* In order to uphold an ALJ's decision to use the grid, there must be "reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Id.* (quoting *Warmoth v. Bowen,* 798 F.2d 1109, 1112 (7th Cir. 1986)).

25

Here, we find that there is enough reliable evidence to persuade a reasonable person that claimant's alleged limitations do not significantly diminish the employment opportunities otherwise available to him. Following claimant's onset date, the record demonstrates claimant saw Dr. Mitchell between April and July 2004 and Dr. Fregia between June and July 2004. As discussed above, the last report from Dr. Fregia on July 7, 2004 indicated that claimant was doing well. (R. 182). The administrative record contains minimal treatment records after that date. The ALJ specifically mentioned claimant's failure to seek treatment after July 2004 in his opinion. (R. 23). Furthermore, the fact that claimant suffered from recurrent episodes in 2003 and early 2004 does not demonstrate that claimant continued to suffer from those episodes after July 2004. The few records claimant submitted after July 2004 are insufficient to support claimant's contention that he continued to have frequent recurrent episodes that impacted his ability to work. Additionally, while claimant testified that he continued to suffer from recurrent episodes after July 2004, the ALJ found that his testimony was not entirely credible. (R. 23-24).

Based on the lack of medical records after July 2004 and the fact that this Court upheld the ALJ's credibility determination, we find that claimant failed to demonstrate that his non-exertional impairments were severe enough to substantially limit his ability to work during the relevant time period. Thus, the ALJ's finding that claimant could perform a full range of sedentary work is supported by substantial evidence. Accordingly, this Court finds that the ALJ's use of the grid was appropriate. Moreover, even if the ALJ erred in using the grid, we find any such error to be harmless because the ALJ also consulted a vocational expert and relied on his testimony. (R. 25-26). *See*

SSR 83-12 ("Where the extent of erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource.").  Based on the foregoing, this Court finds that remand is not warranted here.

**CONCLUSION**

For the reasons set forth above, claimant's motion for summary judgment is denied.  The Commissioner's motion for summary judgment is granted.  The decision of the ALJ is affirmed.  It is so ordered.

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED:**     **May 2, 2008**